**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**CITY OF SYRACUSE,**

<b>Plaintiff,</b>

    **vs.**                                      **5:11-cv-744**
                                                   **(MAD/TWD)**

**LOOMIS ARMORED US, LLC,**

<b>Defendant.</b>

_____

**APPEARANCES:**                              **OF COUNSEL:**

**CITY OF SYRACUSE**                    **JAMES P. McGINTY, ESQ.**
**OFFICE OF CORPORATION COUNSEL**    **SHANNON T. O'CONNOR, ESQ.**
233 East Washington Street
City Hall
Syracuse, New York 13202
Attorneys for Plaintiff

**HAYNES & BOONE, LLP**               **JONATHAN D. PRESSMENT, ESQ.**
30 Rockefeller Plaza - 26th Floor
New York, New York 10112
Attorneys for Defendant Loomis
Armored US, LLC

**Mae A. D'Agostino, U.S. District Judge:**

<b>MEMORANDUM-DECISION AND ORDER</b>

<b>I. INTRODUCTION</b>

On June 8, 2011, Plaintiff filed a complaint in New York State Supreme Court,

Onondaga County, alleging causes of action for breach of contract and negligence. On July 1,

2011, Defendant Loomis Armored US, LLC ("Defendant" or "Loomis") removed the action to

this Court pursuant to 28 U.S.C. § 1446, asserting that the Court possesses jurisdiction over the

matter pursuant to 28 U.S.C. § 1332(a) by virtue of the fact that complete diversity exists

between the parties and the amount in controversy exceeds $75,000.

On July 8, 2011, Defendant filed a motion to dismiss the complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, arguing that the complaint is time barred and that it fails to state any *prima facie* claims for relief. Thereafter, on July 21, 2011, Plaintiff filed a motion to remand the action back to state court. *See* Dkt. No. 5. In a December 15, 2011 Memorandum-Decision and Order, the Court denied Plaintiff's motion to remand. *See* Dkt. No. 16.

In a letter dated January 4, 2012, Plaintiff informed the Court that it did not intend to oppose Defendant's motion to dismiss. *See* Dkt. No. 17. On January 11, 2012, the Court granted Defendant's motion to dismiss, but granted Plaintiff an opportunity to amend its complaint. *See* Dkt. No. 19. On January 31, 2012, Plaintiff filed its amended complaint. *See* Dkt. No. 22. The amended complaint included five claims against Defendant, as well as claims against three new Defendants (Michael Bucci, Sean McGuigan, and Ronald Mancuso). *See id.*

On February 27, 2012 and March 15, 2012, Defendant and Michael Bucci filed motions to dismiss the amended complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. *See* Dkt. Nos. 31 & 35. In a May 24, 2012 Memorandum-Decision and Order, the Court denied without prejudice to renew the motions to dismiss and directed the parties to submit supplemental memoranda of law addressing the Court's jurisdictional concerns. *See* Dkt. No. 46. Specifically, the Court was concerned that it no longer had jurisdiction over this action because of the addition of several non-diverse Defendants in the amended complaint. *See id.*

In light of the Court's concerns, Plaintiff submitted two notices of dismissal. In these notices, Plaintiff agreed to voluntarily dismiss Michael Bucci, Sean McGuigan and Ronald

Mancuso as Defendants pursuant to Rule 41(a)(1)(A)(ii) of the Federal Rules of Civil Procedure. *See* Dkt. Nos. 52, 54 & 55. On July 11, 2012, the Court granted the dismissal of Ronald Mancuso, who had not yet appeared in this matter, and on July 17, 2012, the parties filed a joint stipulation dismissing Michael Bucci and Sean McGuigan. *See* Dkt. Nos. 55 & 57. As such, Plaintiff voluntarily withdrew all claims against the non-diverse Defendants and the Court may now proceed to consider the merits of Defendant's renewed motion to dismiss. *See* Dkt. No. 31 & 32.

Currently before the Court is Defendant's renewed motion to dismiss the amended complaint.

## II. BACKGROUND

Plaintiff is a New York municipal corporation with its principal place of business located at City Hall, 233 East Washington Street, Syracuse, New York 13202. *See* Dkt. No. 22 at ¶ 2. Defendant is a Texas limited liability company with its principal place of business located at 2500 City West Boulevard, Suite 900, Houston, Texas 77042. *See id.* at ¶ 3. Defendant, *i.e.*, Loomis Armored US, LLC, was formerly known as Loomis, Fargo & Co. ("Loomis Fargo"). *See* Dkt. No. 31 at Exhibit "B."

In January of 2000, pursuant to General Municipal Law § 103, Plaintiff announced open bidding on contract number 00-0088 (the "2000 Contract") for collection service for parking meters in the City of Syracuse for the Department of Public Works. *See* Dkt. No. 22 at ¶ 10. The bid specifications required that the successful bidder be able to provide armored vehicles with maximum-security locks, a vault to store meter carts, keys and money, armed uniformed guards and collectors, and that the successful bidder "'shall employ all of the safety procedures

and devices necessary to safely transport currency from meters to the Key Bank, Main Office, Syracuse, New York.'" *See id.* at ¶ 11. On or about January 12, 2000, Armored Motor Service of America, Inc. ("AMSA"), a domestic corporation located at 101 Victor Heights Parkway, Victor, New York 14564, bid on the 2000 Contract. *See id.* at ¶ 12. AMSA operated as an armored car carrier in Onondaga County. *See id.* On or about March 28, 2000, Plaintiff executed the 2000 Contract with AMSA. *See id.* at ¶ 15. The duration of the agreement was for two (2) years, plus the option of three (3) one-year extensions. *See id.* Pursuant to the contract, AMSA agreed to assume "'sole liability for loss or theft of containers or receptacles, and coins while in [its] possession and control.'" *See id.* at ¶ 16.

According to Plaintiff, Sean McGuigan began employment with AMSA in 1996 as an armored car guard and was eventually assigned the downtown or Armory Square route under the parking meter collection contract. *See id.* at ¶ 19. Moreover, Plaintiff claims that each armored car guard engaged in work duties before and after each route, including, but not limited to, signing out trucks, weapons, radios, and, pursuant to AMSA's contract with Plaintiff, keys to open the meters. *See id.* at ¶ 20. The armored guards used a key to unlock the parking meters and a canister with parking meter revenue was dropped into a sealed and locked container on wheels. *See id.* at ¶ 22. Once the sealed container was full, the armored guard would drive the armored truck to Key Bank located in downtown Syracuse. *See id.* Key Bank was in possession of the key that would unlock the sealed container holding the coins to be counted. *See id.* at ¶ 23. Upon arrival at the bank, the armored guard provided the bank with a blank manifesto that Key Bank would sign and fill out with the time of arrival and the number of bags of coins delivered by AMSA. *See id.* Thereafter, Key Bank would sort and count the coins collected and would credit Plaintiff's account. *See id.*

In June of 2001, Plaintiff requested that Defendant increase the meter collection pick-ups and deposits from one-day per week to three-days per week in the Armory Square and St. Joseph area. *See id.* at ¶ 24. According to Plaintiff, Key Bank decided to close its money room and outsource the counting of money or coin to an outside agency. *See id.* at ¶ 25. AMSA was awarded this contract sometime between 2001 and 2003, which resulted in AMSA providing all of the counting and sorting of coin and money for Key Bank customers, including Plaintiff. *See id.* Moreover, Plaintiff claims that the money it collected pursuant to its contract with AMSA was now stored at AMSA's vault and that the key for the sealed containers, which was originally in Key Bank's possession, was now in AMSA's possession. *See id.* In April of 2003, Plaintiff exercised its option to extend the 2000 Contract with AMSA. *See id.* at ¶ 26.

On or about June 17, 2003, Defendant purchased all of the "tangible and intangible assets of AMSA," including the service contract with Plaintiff and "the Key Bank counting room." *See id.* at ¶¶ 27, 110. AMSA had approximately 115 employees at their East Syracuse office. *See id.* at ¶ 29. Defendant, which was then named Loomis, Fargo & Co., retained all of these employees, including Sean McGuigan. *See id.*

On or about July 1, 2003, Defendant notified Plaintiff that all future payments for services rendered under the 2000 Contract should be paid to it and not AMSA. *See id.* at ¶ 31. On or about December 9, 2003, Plaintiff exercised its final extension of the 2000 Contract. *See id.* at ¶ 32.

On or about December 21, 2004, Plaintiff opened bidding on contract number 05-088 (the "2005 Contract") for the collection service of parking meters for its Department of Public Works. *See id.* at ¶ 33. Defendant bid on and was awarded the 2005 Contract on or about January 1, 2005 and it was executed in April of 2005. *See id.* Similar to the 2000 Contract,

Plaintiff's contract with Defendant included the option for three (3) one-year extensions of the contract.  *See id.*

The scope of services to be provided under the 2005 Contract was based upon the collection of 1,100-1,600 single meters, as well as the collection of money from 38-200 pay stations.  *See id.* at ¶ 34.  Pursuant to the 2005 Contract, under the subheading "Keys," the contractor agreed that any keys "'shall be safeguarded by the contractor and returned to the Department of Public Works upon termination. . . .  In the event of a lost key . . . contractor will be responsible for the costs of replacement . . . [and] any lost keys by the contractor shall be immediately reported to the Bureau of Transportation.  The Contractor shall not make or acquire duplicates of any City Keys, except as authorized by the Commissioner of Public Works.'"  *See id.* at ¶ 35 (quotation omitted).  Moreover, the 2005 Contract required Defendant to ensure that collections were made "'in a sealed container unit furnished by the contractor.'"  *See id.* at ¶ 36 (quotation omitted).  Moreover, Defendant agreed to "'assume sole liability for loss or theft of containers or receptacles, and coins while in his possession of control, such liability to be measured by the average amount of collection per can or receptacle for the previous four (4) weeks collection.  However, the limit of liability for theft shall be twenty thousand dollars per day aggregate.'"  *See id.* at ¶ 37 (quotation omitted).

By correspondence dated November 17, 2005, Plaintiff's Office of Budget and Management extended the 2005 Contract through March 1, 2006.  *See id.* at ¶ 38.  In January of 2006, Plaintiff opened bidding on contract number 06-113 (the "2006 Contract"), for the collection service of parking meters.  *See id.* at ¶ 39.  On or about February 1, 2006, Plaintiff sent Defendant a notice of intent to award letter indicating that the estimated contract price was $95,040, and that a certificate of insurance was required to award and execute the contract.  *See*

*id.* at ¶ 40.  The parties executed the 2006 Contract on July 7, 2006.  *See id.*

The scope of the collection services of the 2006 Contract included transportation in an armored vehicle with maximum security locks, a vault to store meter carts, keys, and money, armed uniformed guards and collectors, and required Defendant to "'employ all of the safety procedures and devices necessary to safely transport currency from meters'" to its offices.  *See id.* at ¶ 41 (quotation omitted).  Moreover, the 2006 Contract provided that Defendant would "'assume sole liability for the loss or theft of containers or receptacles, and coins while in his possession or control, such liability to be measured by the average amount of collection per can or receptacle for the previous four (4) weeks collection.  However, the limit of liability for theft shall be twenty thousand ($20,000) dollars per day aggregate.'"  *See id.* at ¶ 42 (quotation omitted).

Similar to the 2005 Contract, in the 2006 Contract Defendant agreed to safeguard all keys necessary to perform the services required by the contract and to report any lost keys to Plaintiff immediately.  *See id.* at ¶ 44 (citation omitted).  Further, the 2006 Contract provided that "'[t]he Contractor shall not make or acquire duplicates of any City Keys, except as authorized by the Commissioner of Public Works.'"  *See id.* (quotation omitted).  It also provided that "'[c]ollections shall be made in a sealed container unit furnished by the contractor. . . . Said complete collection units to be provided by the Contractor shall include the keyhead devices, the carts, and the coin containers.'"  *See id.* (quotation omitted).  Plaintiff exercised its option to extend the 2006 Contract three times through September 2, 2010.  *See id.* at ¶¶ 45-46 (citations omitted).  On March 31, 2011, Plaintiff terminated its contract with Defendant for parking meter collections.  *See id.* at ¶ 47.

**B.** **Factual allegations surrounding Plaintiff's discovery of the parking meter thefts, FBI investigation, concealment of the crime, and the criminal sentencing of Sean McGuigan and Ronald Mancuso**

In unrelated federal litigation, the United States Attorney's Office for the Northern District of New York indicted Paul and Steven Mancuso (Ronald Mancuso's brothers) for their involvement in illegally removing asbestos from central New York properties. *See id.* at ¶¶ 80-81. At some point between October 28, 2009 and May 24, 2010 – the date of conviction and sentencing, respectively – Paul and Steven Mancuso informed FBI agents of the parking meter thefts as a means of punishing Ronald Mancuso for testifying against them in the federal case and to seek leniency at their sentencings. *See id.* at ¶¶ 84-85. At some point in late November 2009, the FBI opened an investigation into the coin thefts. *See id.* at ¶ 86. On November 25, 2009, Ronald Mancuso confessed to the parking meter theft scheme. *See id.* at ¶ 87. On or about February 7, 2010, federal agents interviewed Sean McGuigan and obtained a confession regarding his involvement in the thefts. *See id.* at ¶ 89.

In late November of 2009, federal agents informed an employee of Plaintiff's Department of Public Works about the parking meter thefts. *See id.* at ¶ 90. Plaintiff claims that, "[u]pon information and belief, federal agents specifically told this employee not to inform anyone of the thefts because of an on-going criminal investigation into the matter." *See id.* During an interview with the FBI, Plaintiff claims that Sean McGuigan explained how he was able to remove the key to the padlock, which opened the sealed container holding the coins, without any questions or detection by management. *See id.* at ¶ 91. Plaintiff claims that the key was hanging on the wall at Defendant's office, which allowed Sean McGuigan to remove the key, keep it overnight, make a copy of it at Home Depot, and return it the next morning. *See id.* at ¶¶ 92-93.

According to Plaintiff, the coin theft scheme operated as follows:

-Plaintiff requested an increase in parking meter collections sometime in 2001 for the Armory Square and St. Joseph Hospital area of the city.

-The collection schedule increased from one day per week to three days per week.

-The scheduled collections and deposits were now on Monday, Tuesday, and Friday.

-Defendant's management assigned Sean McGuigan to the collection and deposit routes in Armory Square.

-Every Tuesday Ronald Mancuso would drive from Utica, New York in an off-white van, a similar color to the armored trucks in Defendant's fleet, to meet Sean McGuigan along his parking meter collection route after he completed his job duties.

-Sean McGuigan would enter the rear of the van, unlock the padlock on the sealed canister and empty the coin into bags, which would take several minutes.

-Upon completion, Sean McGuigan would exit the van and continue on his collection route and Ronald Mancuso would drive back to Utica, New York to sort the coins.

-Upon his return to Utica, New York, Ronald Mancuso would sort the coins because they only intended to steal the quarters.

-Once the quarters were separated, Ronald Mancuso would convert some but not all of the coins to paper currency.

-Sean McGuigan and Ronald Mancuso would then meet in Utica, New York on Wednesday or Thursday to split the proceeds.

-The following Tuesday, Ronald Mancuso would deliver the nickels and dimes that were sorted out back to Sean McGuigan while working on his collection route.

-Once the contents of Sean McGuigan's canister had been emptied in the rear of the van, these nickels and dimes from the previous Tuesday's collection were then placed in the collection cart.

-Initially, Sean McGuigan's share was approximately $200 per week from the thefts, but, as the scheme progressed, his share per week rose to $1,000 per week.

*See id.* at ¶ 95(a)-(s).

Plaintiff claims that, at the time of his confession to the FBI in February of 2010, Sean McGuigan admitted that he continued to steal $100 to $200 from Plaintiff's parking meters on his weekly collection route. *See id.* at ¶ 96. On February 10, 2010, Sean McGuigan turned over approximately thirteen bags of coins to federal agents, which amounted to approximately $12,000. *See id.* at ¶¶ 98, 100. After obtaining Sean McGuigan's confession in February of 2010, federal agents briefed Plaintiff on the theft perpetrated by Sean McGuigan and Ronald Mancuso. *See id.* at ¶ 99. Moreover, federal agents recovered approximately $300,000 from Ronald Mancuso. *See id.* at ¶ 100.


**C.    Plaintiff's amended complaint**

On June 8, 2011, Plaintiff filed a complaint in New York State Supreme Court, Onondaga County, alleging causes of action for breach of contract and negligence. On July 1, 2011, Defendant removed the action to this Court pursuant to 28 U.S.C. § 1446. On January 31, 2012, Plaintiff filed its amended complaint. *See* Dkt. No. 22. The amended complaint includes five claims against Defendant, as well as claims against three additional individuals, who Plaintiff voluntarily dismissed from this action after the Court expressed jurisdictional concerns. *See* Dkt. No. 46.

Plaintiff's first cause of action, which is entitled "Successor Liability against Loomis," asserts that Defendant "has successor liability and is responsible for the liabilities of AMSA and Loomis, Fargo, & Co., including contractual damages and the duty owed to the City of Syracuse

as a bailee for hire." *See id.* at ¶ 125. In its second cause of action, Plaintiff claims that Defendant breached the 2005 and 2006 Contracts, which terminated in March of 2011. *See id.* at ¶¶ 126-136. Plaintiff claims that these contracts were breached by Defendant's (1) failure to store the keys to the sealed canisters securely and to "'employ all of the safety measures and devices necessary to safely transport currency from [the] meters[;]'" (2) failure to ensure that no keys were duplicated; and (3) failure to ensure that collection containers remained sealed during the collection routes. *See id.* at ¶ 134.

In its third cause of action, Plaintiff claims that Defendant submitted, among other things, fraudulent monthly invoices regarding the amount of coins collected as a result of the ongoing thefts. *See id.* at ¶¶ 137-56. In its fourth cause of action, Plaintiff claims that Defendant was negligent in performing its obligations and in the statements that it made, and that Section 89-bbb(6) of the Armored Car Carrier Act in New York's General Business Law "creates an independent duty distinct" from Defendant's contractual obligations. *See id.* at ¶¶ 157-76. Finally, Plaintiff's fifth cause of action alleges conversion. *See id.* at ¶¶ 177-82. Specifically, Plaintiff claims that Defendant had legal ownership of all coins it collected; that Sean McGuigan, while acting within the scope of his duties, exercised an unauthorized dominion over the coins collected; that Defendant's management participated in the conversion when it counted, sorted, and altered the coins belonging to Plaintiff; and that Defendant was under a duty to ensure that its employee did not alter the condition of the collected coins. *See id.*

# III. DISCUSSION

## A.    Standard of review

A motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure tests the legal sufficiency of the party's claim for relief. *See Patane v. Clark*, 508 F.3d 106, 111-12 (2d Cir. 2007) (citation omitted). In considering the legal sufficiency, a court must accept as true all well-pleaded facts in the pleading and draw all reasonable inferences in the pleader's favor. *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (citation omitted). This presumption of truth, however, does not extend to legal conclusions. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). Although a court's review of a motion to dismiss is generally limited to the facts presented in the pleading, the court may consider documents that are "integral" to that pleading, even if they are neither physically attached to, nor incorporated by reference into, the pleading. *See Mangiafico v. Blumenthal*, 471 F.3d 391, 398 (2d Cir. 2006) (quoting *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152-53 (2d Cir. 2002)).

To survive a motion to dismiss, a party need only plead "a short and plain statement of the claim," *see* Fed. R. Civ. P. 8(a)(2), with sufficient factual "heft to 'sho[w]' that the pleader is entitled to relief[,]'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007) (quotation omitted). Under this standard, the pleading's "[f]actual allegations must be enough to raise a right of relief above the speculative level," *see id.* at 555 (citation omitted), and present claims that are "plausible on [their] face," *id.* at 570. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (citation omitted). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and

12

plausibility of "entitlement to relief.'"" *Id.* (quoting [*Twombly*, 550 U.S.] at 557, 127 S. Ct.

1955). Ultimately, "when the allegations in a complaint, however true, could not raise a claim

of entitlement to relief," *Twombly*, 550 U.S. at 558, or where a plaintiff has "not nudged [its]

claims across the line from conceivable to plausible, the[ ] complaint must be dismissed[,]" *id.*

at 570.


**B.      Successor liability**

In its motion to dismiss the amended complaint, Defendant first claims that successor

liability is not an independent cause of action but rather a theory of liability upon which other

causes of action may be premised. *See* Dkt. No. 32 at 15-16.[1]  Further, Defendant asserts that,

even if Plaintiff was able to assert a claim for successor liability against it for AMSA's alleged

liabilities, Plaintiff's claim must still fail because the Court already concluded that Plaintiff's

claims against AMSA are time-barred and dismissed those claims with prejudice. *See id.* at 16.

Finally, Defendant concedes that it was formerly known as Loomis, Fargo & Co. and that the

two companies are "one-in-the-same;" and, therefore, "any claims asserted with respect to

Loomis Fargo are entirely duplicative of claims asserted against Loomis and should be

dismissed." *See id.* (citation omitted).

Plaintiff, however, asserts that it has set forth sufficient facts to establish successor

liability and that the Second Circuit has continuously recognized successor liability as a

separate cause of action when it is required as a cause of action for other claims, including

fraud. *See* Dkt. No. 38 at 9. Specifically, Plaintiff contends that it has sufficiently pled that

---

[1] To avoid confusion, anytime the Court references a specific page number for an entry on the docket, it will cite to the page number assigned by the Court's electronic filing system.

Defendant and AMSA underwent a *de facto* merger – one of the exceptions to the general rule finding that a business entity acquiring the assets from another business generally results in no successor liability. *See id.* at 10. Moreover, Plaintiff contends that the Court has not yet ruled whether its claims against Defendant for successor liability for fraud, negligence, and conversion based on its predecessor's actions are time barred. *See id.* at 11.

New York courts have carved out four exceptions to the general rule that a corporation that acquires the assets of another is not liable for the selling corporation's tort and contract obligations. *See Schumacher v. Richards Shear Co., Inc.*, 59 N.Y.2d 239, 244 (1983). Successor liability will be imposed on the surviving entity if "(1) it expressly or impliedly assumed the predecessor's tort liability, (2) there was a consolidation or merger of seller and purchaser, (3) the purchasing corporation was a mere continuation of the selling corporation, or (4) the transaction is entered into fraudulently to escape such obligations." *Id.* at 245; *see also Fitzgerald v. Fahnestock & Co., Inc.*, 286 A.D.2d 573, 575 (1st Dep't 2001) (holding that the *de facto* merger doctrine is applicable to breach-of-contract actions) (citation omitted). "The second and third items are based on the concept that a successor that effectively takes over a company in its entirety should carry the predecessor's liabilities as a concomitant to the benefits it derives from the good will purchased." *Grant-Howard Assocs. v. Gen. Housewares Corp.*, 63 N.Y.2d 291, 296 (1984). The general rule and the four acknowledged exceptions apply equally to tort and contract cases. *See Colon v. Multi-Pak Corp.*, 477 F. Supp. 2d 620, 626 (S.D.N.Y. 2007) (citing *Cargo Partner AG v. Albatrans, Inc.*, 352 F.3d 41, 45 (2d Cir. 2003)).

Plaintiff argues that this merger falls within the requirements for the second exception listed above because it satisfies all of the elements of a "*de facto* merger." In the absence of an actual merger of two or more entities, a court may deem a transaction structured as a purchase-

of-assets to fall within the *de facto* merger exception if the following factors are present:

> (1) continuity of ownership; (2) cessation of ordinary business operations and the dissolution of the selling corporation as soon as possible after the transaction; (3) the buyer's assumption of the liabilities ordinarily necessary for the uninterrupted continuation of the seller's business; and (4) continuity of management, personnel, physical location, assets and general business operation[.]

*In re New York City Asbestos Litig.*, 15 A.D.3d 254, 256 (1st Dep't 2005) (citation omitted). The continuity-of-ownership element is typically satisfied where the purchasing corporation pays for the acquired assets with shares of its own stock. *See Cargo Partner*, 352 F.3d at 46 n.4 (citation omitted). The seller therefore continues to own the assets it has sold through its ownership of shares in the purchasing corporation. *See id.*

"The continuity-of-ownership element 'is designed to identify situations where the shareholders of a seller corporation retain some ownership interest in their assets after cleansing those assets of liability.'" *New York v. National Service Indus., Inc.*, 460 F.3d 201, 211 (2d Cir. 2006) (quoting *United States v. Gen. Battery*, 423 F.3d 294, 306 (3d Cir. 2005)). "Where one corporation purchases another corporation's assets, a continuity of ownership exists where the predecessor corporation's shareholders become direct or indirect shareholders of the successor corporation." *Ortiz v. Green Bull, Inc.*, No. 10-CV-3747, 2011 WL 5554522, *10 (E.D.N.Y. Nov. 14, 2011) (citing *In re New York City Asbestos Litig.*, 15 A.D.3d 254, 256, 789 N.Y.S.2d 484, 486-87 (1st Dep't 2005)). Thus, although a continuity of ownership is "typically satisfied where the purchasing corporation pays for the acquired assets with shares of its own stock", *National Service Indus.*, 460 F.3d at 210 n.2, a court can still find continuity of ownership where a corporation pays for the assets in cash. *See Nettis v. Levitt*, 241 F.3d 186, 194 (2d Cir. 2001), *overruled on other grounds*, *Slayton v. American Exp. Co.*, 460 F.3d 215 (2d Cir. 2006).

Moreover, as the Second Circuit noted in *National Service Indus.*, although the continuity of ownership requirement is still necessary in tort cases, it does not mean that courts might not read the standard flexibly so that "other indicia of control over or continuing benefit from the sold assets might . . . be sufficient to satisfy the continuity of ownership factor." *National Service Indus., Inc.*, 460 F.3d at 215 n.5. The Second Circuit has instructed that courts should analyze the *de facto* merger factors in a flexible, rather than formulaic, manner, and that the court should consider "whether, in substance, it was the intent of [the successor] to absorb and continue the operation of the [predecessor]." *Nettis*, 241 F.3d at 193-94 (brackets in original) (citations omitted).

In the present matter, Plaintiff has pled sufficient facts to survive Defendant's motion to dismiss on this ground. Specifically, Plaintiff has alleged that (1) "a three party asset purchase agreement was entered into between Loomis, Fargo, & Co., a Texas Corporation, AMSA, and Michael Bucci on or about June 17, 2003; (2) in October of 2003, Michael Bucci, the former president and CEO of AMSA, became Defendant's vice president of operations; (3) Defendant continued to operate from AMSA's former office in East Syracuse and eventually retained all of AMSA's 115 employees, including Sean McGuigan; (4) Defendant acquired and used AMSA's equipment, such as the money counters and trucks, and covered the AMSA name with its own; (5) the same management who operated AMSA operated Loomis, Fargo & Co., and continues to play a role in Defendant's operations; (6) Defendant notified Plaintiff on July 1, 2003 that all future payments for services rendered under the 2000 Contract should be paid to them; and (7) Defendant continued to perform AMSA's obligations under the 2000 Contract with Plaintiff.

*See* Dkt. No. 22 at ¶¶ 27-32, 110, 120-21.[2]

Based on the foregoing, the Court finds that Plaintiff has alleged facts that plausibly suggest that Defendant may be held liable for the conduct of its predecessor, *i.e.*, AMSA. As such, the Court denies Defendant's motion to dismiss this claim.

Moreover, the Court agrees with Defendant that, in the circumstances presented in this case, "successor liability" is not a separate cause of action but merely a theory for imposing liability on a defendant based on the predecessor's conduct. Although the Court was unable to find New York or Second Circuit case law reaching such a holding, other courts have agreed with this finding. *See Automotive Indus. Pension Trust Fund v. Ali*, No. C-11-5216, 2012 WL 2911432, *8 (N.D. Cal. July 16, 2012) (holding that, in the context of ERISA, successor liability is not an independent cause of action but simply a theory for imposing liability based on a predecessor's ERISA violation) (citations omitted); *Tindall v. H & S Homes, LLC*, No. 5:10-CV-044, 2012 WL 369286, *2 (M.D. Ga. Feb. 3, 2012) (holding that "'[s]uccessor liability is not a tort. It is an equitable tool used to transfer liability from a predecessor to a successor'" (quotation omitted)). It is clear that the doctrine of successor liability, in this context, does not create a new cause of action against the successor so much as it transfers the liability of the predecessor to the successor.

Although Plaintiff provided "successor liability" as a separate cause of action, it is clear

---

[2] The Court notes that Plaintiff has also brought a successor liability claim against Defendant for the actions of Loomis, Fargo & Co. Defendant, however, "readily concedes that it was formerly known as Loomis Fargo and that the 'two' companies are, in fact, one-in-the-same." *See* Dkt. No. 32 at 16. As such, Defendant seeks to dismiss Plaintiff's claims against it for successor liability as to Loomis, Fargo & Co. as duplicative. *See id.* In light of Defendant's concession, the Court finds that Plaintiff's successor liability claim relating to Loomis, Fargo & Co. is unnecessary for the Court to find that Defendant may be held liable for Loomis, Fargo & Co.'s alleged breach of contract, fraud and/or negligence, so long as the claim is not otherwise precluded by law.

that Plaintiff has included this cause of action in response to the Court's dismissal of its claims against AMSA and in an attempt to hold Defendant responsible for AMSA's alleged breach of contract, fraud, conversion and negligence. As such, the Court will treat Plaintiff's "successor liability" cause of action as simply an assertion that Defendant is liable for the alleged conduct of AMSA, its predecessor. As discussed below, however, the statute of limitations relevant to each claim still precludes Plaintiff's claims against Defendant for AMSA's alleged conduct.

## C.    Statute of limitations

Defendant contends that, even if Plaintiff is able to assert a claim for successor liability, the Court already concluded that its claims against AMSA are time-barred and dismissed these claims with prejudice. *See* Dkt. No. 32 at 16. As such, Defendant claims that Plaintiff cannot hold it responsible for AMSA's alleged liabilities regardless of whether the Court deems an independent claim for successor liability actionable. *See id.* Further, Defendant seeks dismissal of Plaintiff's claims against it to the extent that they are barred by the applicable statute of limitations.

### 1. Contract causes of action

In New York, a six-year limitations period governs breach of contract claims. *See Guilbert v. Gardner*, 480 F.3d 140, 149 (2d Cir. 2007) (citing N.Y. C.P.L.R. § 213(2)). Generally, this limitations period begins to run when the cause of action accrues. *See id.* (citing N.Y. C.P.L.R. § 203(a)). "A cause of action for breach of contract ordinarily accrues and the limitations period begins to run upon breach." *Id.* (citing *Ely-Cruikshank Co. v. Bank of Montreal,* 81 N.Y.2d 399, 599 N.Y.S.2d 501, 615 N.E.2d 985, 986 (1993)). "If, however, a

contract requires continuing performance over a period of time, each successive breach may begin the statute of limitations running anew." *Id.* (citing *Bulova Watch Co. v. Celotex Corp.*, 46 N.Y.2d 606, 415 N.Y.S.2d 817, 389 N.E.2d 130, 132 (1979)) (other citations omitted).

In the present matter, Plaintiff filed its complaint in New York State Supreme Court, Onondaga County, on June 8, 2011. *See* Dkt. No. 1-3. Plaintiff filed its amended complaint on January 31, 2012. *See* Dkt. No. 22. In the amended complaint, Plaintiff claims that Defendant purchased AMSA on or about June 17, 2003. *See id.* at ¶ 27. Moreover, after Defendant purchased AMSA, Defendant continued to perform under the 2000 Contract with Plaintiff and Plaintiff eventually awarded a new contract to Defendant on or about January 1, 2005, which was executed in April of 2005. *See id.* at ¶¶ 31-33.

Even assuming that AMSA's liability under the 2000 Contract continued after Defendant purchased AMSA until the time when Plaintiff and Defendant entered into the 2005 Contract, Plaintiff's claims against Defendant as AMSA's successor are untimely. Defendant and Plaintiff entered into the 2005 Contract in April of 2005. *See id.* at ¶ 33. Plaintiff, however, did not file this action until June 8, 2011. *See* Dkt. No. 1. Plaintiff attempts to avoid this Court's previous dismissal of AMSA from this action by now reframing its claim as a breach of contract claim against Defendant as AMSA's successor. Regardless of how Plaintiff words its complaint, whether as a direct claim against AMSA or against Defendant as AMSA's successor, as the Court previous held, June 8, 2005 is the earliest possible date not barred by New York's six-year statute of limitations. *See Guilbert*, 480 F.3d at 150. As such, although Defendant was possibly liable at one point for AMSA's contractual liabilities, all such claims have now expired.

Based on the foregoing, the Court finds that Plaintiff's breach of contract claims accruing prior to June 8, 2005 are barred by New York State's six-year statute of limitations,

both as to Plaintiff's claims against Defendant as AMSA's successor, and as to its claims brought directly against Defendant.

### 2. Negligence causes of action

Under New York law, a negligence claim is governed by a three-year statute of limitations. *See* N.Y. C.P.L.R. § 214. This limitations period begins to run from the date of the alleged negligent act, regardless of when it was allegedly discovered or should have been discovered. *See Ruso v. Morrison*, 695 F. Supp. 2d 33, 44-45 (S.D.N.Y. 2010) (holding that, "'[s]tated another way, accrual occurs when the claim becomes enforceable, *i.e.*, when all elements of the tort can be truthfully alleged in a complaint'" (quotation and other citation omitted)); *see also Bond v. Progressive Ins. Co.*, 82 A.D.3d 1318, 1320-21 (3d Dep't 2011) (quotation omitted).

In the present matter, having filed its complaint on June 8, 2011, the furthest Plaintiff may reach back with respect to any of its negligence claims is June 8, 2008. Further, as discussed below, Plaintiff has not alleged any facts which would support the application of equitable estoppel in this matter. *See Tanz v. Kasakove*, No. 08 Civ. 1462, 2008 WL 2735973, *1 (S.D.N.Y. July 7, 2008) (citations omitted). Therefore, Plaintiff may not proceed under the theory of successor liability against Defendant as AMSA's successor since Defendant purchased AMSA in 2003 and entered into its own contract with Plaintiff in April of 2005. Similarly, as this Court previously held, Plaintiff's negligence claims against Defendant accruing prior to June 8, 2008 are barred.

Based on the foregoing, the Court finds that Plaintiff's negligence claims accruing prior to June 8, 2008, are barred by New York State's three-year statute of limitations.

### *3. Fraud*

In its third cause of action, Plaintiff alleges that Defendant, as well as AMSA and Mr. McGuigan, made materially false and fraudulent representations to it, which Plaintiff justifiably relied upon in continuing the parties' relationship. *See* Dkt. No. 22 at ¶¶ 137-156. Plaintiff claims that it did not discover the alleged fraud until February of 2010 and, therefore, the complaint filed on June 8, 2011 is timely since it is within two years of the discovery of the fraud. *See id.* at ¶ 138.

In New York, a fraud cause of action "must be brought within six years from the date of the fraud or two years from the time that a plaintiff discovered or could have, with reasonable diligence, discovered the fraud." *Adams Book Co. v. Ney*, No. 97-CV-4418, 2002 WL 31946713, *6 (E.D.N.Y. Dec. 3, 2002) (citations omitted); *see also ABB Indus. Systems, Inc.*, 120 F.3d at 360 (citing N.Y. Civ. Prac. L. § 213(8)). Plaintiff's claim will therefore be time-barred only if more than six years have passed since the date of the fraudulent act, or if more than two years have passed since Plaintiff "discovered the fraud or could, with due diligence, have discovered it." *Kaufman v. Cohen*, 307 A.D.2d 113, 123 (1st Dep't 2003) (citing N.Y. C.P.L.R. § 213(8)).

Under New York law, a plaintiff "could, with due diligence, have discovered" the fraud when provided sufficient facts to place him on "inquiry notice." *Aldrich v. Marsh & McLennan Cos., Inc.*, 52 A.D.3d 435, 436 (1st Dep't 2008) (citations omitted). A defendant, however, "bear[s] a 'heavy burden' in establishing that the plaintiff was on inquiry notice as a matter of law." *Nivram Corp. v. Harcourt Brace Jovanovich, Inc.*, 840 F. Supp. 243, 249 (S.D.N.Y. 1993) (quoting *Phillips v. Kidder, Peabody & Co.*, 782 F. Supp. 854, 859 (S.D.N.Y. 1991)).

In the present matter, Plaintiff has adequately pled that it did not and could not have

discovered the alleged fraud until November 2009 when the FBI informed one of its employees

of Mr. McGuigan's criminal activity.  Moreover, Defendant has failed to establish, at this early

stage, that Plaintiff should have been on inquiry notice of the alleged fraudulent conduct.  *See*

*id.* at 251-52.

Based on the foregoing, the Court finds that Plaintiff has plausibly alleged that it filed its

complaint within two years of discovering, or when it could have discovered, the alleged

fraudulent activity.  As such, the Court denies Defendant's motion to dismiss Plaintiff's fraud

cause of action on this ground.


### 4. Conversion

In its fifth cause of action, Plaintiff asserts a conversion claim against Defendant.

Specifically, Plaintiff claims that, while working for Defendant, Mr. McGuigan "exercised

unauthorized dominion over the coins collected" and that he "committed an intentional

unauthorized use of the coin."  *See* Dkt. No. 22 at ¶¶ 179-80.

A claim for conversion under New York law has a three-year statute of limitations and

accrues upon the act of conversion, "regardless of when the conversion is discovered."  *Seneca*

*Ins. Co. v. Wilcock*, No. 01 Civ. 7620(WHP), 2002 WL 1067828, *6 (S.D.N.Y. May 28, 2002)

(citing *Lennon v. Seaman*, 63 F. Supp. 2d 428, 440 (S.D.N.Y. 1999)); *see also Marvel*

*Worldwide, Inc. v. Kirby*, 756 F. Supp. 2d 461, 469 (S.D.N.Y. 2010) ("Conversion claims have

a three-year statute of limitations in New York" (citing N.Y. C.P.L.R. § 214(3)).  The statute

begins to run "from the date conversion takes place and not from discovery or the exercise of

diligence to discover."  *Vigilant Ins. Co. of Am. v. Housing Auth.*, 87 N.Y.2d 36, 44 (1995).

Since Plaintiff filed this action on June 8, 2011, any alleged acts of conversion that

occurred before June 8, 2008 are barred by New York's statute of limitations. Although Defendant contends that any misconduct ended in 2005, Plaintiff alleges in the amended complaint that Mr. McGuigan continued to steal $100 to $200 from Plaintiff's parking meters during his collection route through February of 2010. *See* Dkt. No. 22 at ¶ 96. As such, Plaintiff may be able to recover any money allegedly converted from June 8, 2008 through February of 2010. All other conversion claims, however, are barred by New York's three-year statute of limitations.

### 5. *Equitable estoppel and tolling*

Plaintiff claims that "[t]his is exactly the type of case that warrants tolling of the statute of limitations." *See* Dkt. No. 38 at 17. Further, Plaintiff alleges that the Court should estop Defendant from asserting the statute of limitations as an affirmative defense because of its "'affirmative wrongdoing . . . which produced the long delay' in bringing suit." *See id.* (quotation omitted).

"Under New York law, the doctrines of equitable tolling or equitable estoppel 'may be invoked to defeat a statute of limitations defense when the plaintiff was induced by fraud, misrepresentations or deception to refrain from filing a timely action.'" *Abbas v. Dixon*, 480 F.3d 636, 642 (2d Cir. 2007) (quotation and other citation omitted). "In order for the doctrine of equitable estoppel to apply, a plaintiff must 'articulate . . . acts by defendant[ ]that prevented [plaintiff] from timely commencing suit. . . .'" *Ruso v. Morrison*, 695 F. Supp. 2d 33, 46 (S.D.N.Y. 2010) (quotation omitted and alterations in original). "Evidence that the plaintiff 'was the victim of fraud, misrepresentations, or deception' alone is insufficient unless the plaintiff demonstrates that 'those circumstances prevented him from timely filing his

23

complaint.'" *Id.* (quotation omitted). "'Due diligence on the part of the plaintiff in bringing [an] action,' however, is an essential element of equitable relief." *Abbas*, 480 F.3d at 642 (quotation omitted).

"'[W]here fraud or concealment of the existence of a claim prevents an individual from timely filing, equitable tolling of a statute of limitations is permitted until the fraud or concealment is, or should have been, discovered by a reasonable person in the situation.'" *Ruso*, 695 F. Supp. 2d at 47 (quoting *Iavorski v. U.S. I.N.S.*, 232 F.3d 124, 134 (2d Cir. 2000)). "'[E]quitable tolling requires a party to pass with reasonable diligence through the period it seeks to have tolled.'" *Id.* (quotation omitted).

Although whether the plaintiff exercised reasonable diligence to discover his claim is often a question of fact, the plaintiff may fail as a matter of law to satisfy this obligation. *See id.* (citation omitted). The question is not whether the plaintiff was in possession of all information potentially available to him, but instead, "'whether plaintiff knew enough to sue.'" *Id.* (quotation and other citation omitted). Moreover, even where equitable tolling might otherwise apply, the burden is on the plaintiff to show "'that the action was brought within a reasonable period of time after the facts giving rise to the equitable tolling or equitable estoppel claim "have ceased to be operational."'" *Id.* (quotation omitted). Therefore, equitable tolling will not save Plaintiff's claim unless a reasonable person in its situation, through the exercise of due diligence, would not have been able to bring this action until on or after June 8, 2011. *See Simcuski*, 44 N.Y.2d at 450-51.

In *Simcuski v. Saeli*, the New York State Court of Appeals held that "due diligence on the part of the plaintiff in bringing his action is an essential element for the applicability of the doctrine of equitable estoppel, to be demonstrated by the plaintiff when he seeks the shelter of

the doctrine." *Simcuski v. Saeli*, 44 N.Y.2d 442, 450 (1978) (citation omitted). According to the Court of Appeals,

> the burden is on the plaintiff to establish that the action was brought within a reasonable time after the facts giving rise to the estoppel have ceased to be operational. Whether in any particular instance the plaintiff will have discharged his responsibility of due diligence in this regard must necessarily depend on all the relevant circumstances. The length of the legislatively prescribed period of limitations is sometimes said to be relevant, and courts have held that in no event will the plaintiff be found to have exercised the required diligence if his action is deferred beyond the date which would be marked by the reapplication of the statutory period, *i.e.*, that the length of the statutory period itself sets an outside limit on what will be regarded as due diligence.

*Id.* at 450-51 (citation omitted).

In *Gross v. New York City Health & Hosp. Corp.*, 122 A.D.2d 793 (2d Dep't 1986), the plaintiff brought suit against the defendant alleging that her child was paralyzed as a result of the defendant's negligence and medical malpractice. *See id.* at 793. The plaintiff argued that the defendant should be equitably estopped from asserting a statute of limitations defense in light of the her allegations of "'fraud perpetrated by the agents, servants and/or employees of Coney Island Hospital, who misrepresented'" the cause of injury to her child as an "'Act of God' and 'some form of birth defect.'" *See id.* at 794. Disagreeing with the plaintiff, the appellate division held that, among other things, "there is nothing upon which to predicate a finding of scienter on the hospital's part, *i.e.*, that it deliberately intended to dissuade [the plaintiff] from seeking legal redress." *Id.*

In the present matter, as in *Gross*, Plaintiff fails to make any plausible allegation that Defendant knew of and intentionally concealed its employee's illegal activity. Mr. McGuigan was clearly acting outside the scope of his employment, as is discussed in more detail below,

and his conduct does not estop Defendant from relying on the applicable statute of limitations as an affirmative defense. Plaintiff fails to allege any facts indicating that Defendant engaged in fraud, misrepresentations or deceit preventing Plaintiff from timely filing this action.

Moreover, Plaintiff has failed to allege facts establishing that it brought this action within a reasonable time after it was informed by the FBI that Mr. McGuigan was engaged in the alleged illegal activity. As the Second Circuit has held, "[b]ecause a person who seeks equity must do equity, a plaintiff invoking estoppel must show that he brought his action 'within a reasonable time after the facts giving rise to the estoppel have ceased to be operational.'" *Overall v. Estate of Klotz*, 52 F.3d 398, 404 (2d Cir. 1995) (quotation and other citation omitted); *see also Buttry v. General Signal Corp.*, 68 F.3d 1488, 1494 (2d Cir. 1995). Plaintiff filed its complaint on June 8, 2011. *See* Dkt. No. 1. Plaintiff claims that in late November of 2009, federal agents informed one of its employees in the Department of Public Works about the alleged parking meter thefts. *See* Dkt. No. 22 at ¶ 90. Plaintiff further alleges that, "[u]pon information and belief, [the] federal agents specifically told this employee not to inform anyone of the thefts because of an on-going criminal investigation into the matter." *See id.* Although Plaintiff implies that this request by the federal agents prevented it from pursuing its rights in November of 2009, Plaintiff ignores the fact that it could have filed its complaint under seal in order to preserve its rights without revealing the ongoing criminal investigation. *See U.S. v. Funds Representing Proceeds of Drug Trafficking in Amount of $75,868.62*, 52 F. Supp. 2d 1160, 1161 (C.D. Cal. 1999) (noting that in order to prevent a statute of limitations issue, the complaint was filed under seal, *ex parte*, because the case involved a money laundering operation which was still under criminal investigation).

Even if the Court were to believe that Plaintiff could not have filed its original complaint

under seal while the criminal investigation was still ongoing, Sean McGuigan confessed his criminal activity on February 7, 2010 and turned over approximately thirteen bags of coins to federal agents on February 10, 2010. *See* Dkt. No. 22 at ¶¶ 89, 98. Therefore, even if the Court were to assume that Plaintiff was precluded from commencing this action until February 7, 2010, Plaintiff has failed to allege how filing their complaint on June 8, 2011 – sixteen months later – constitutes bringing its claim "'within a reasonable time after the facts giving rise to the estoppel have ceased to be operational.'" *Overall*, 52 F.3d at 404 (quotation and other citation omitted).

Based on the foregoing, the Court finds that Plaintiff has failed to allege facts establishing that Defendant should be estopped from relying on the statute of limitations as an affirmative defense or that it is entitled to have its claims equitably tolled. *See Tanz v. Kasakove*, No. 08 Civ. 1462, 2008 WL 2735973, *1 (S.D.N.Y. July 7, 2008) (dismissing the complaint where the plaintiff who discovered the facts giving rise to the estoppel in December of 2006 but did not file her suit until February of 2008 failed to allege that she acted with "sufficient alacrity" to warrant the application of equitable estoppel).

C.     **Sufficiency of Plaintiff's claims**

   *1. Breach of contract*

Defendant argues that the amended complaint fails to set forth a *prima facie* claim for breach of contract. *See* Dkt. No. 32 at 23-25. Defendant claims that only claims occurring on or after June 8, 2005 are timely and, "apart from a single assertion that McGuigan's thefts continued until 2010 . . . , the Amended Complaint is bereft of any allegations to suggest that any thefts took place in the actionable time period on or following June 8, 2005." *See id.* at 23.

Further, Defendant references several documents that it claims establish that the last of the alleged thefts occurred no later than 2005. *See id.* at 24 (citations omitted).

Under New York law, a plaintiff alleging a breach of contract claim must allege the following elements: (i) the existence of a contract; (ii) adequate performance of the contract by the plaintiff; (iii) breach by the other party; and (iv) damages suffered as a result of the breach. *See Harsco Corp. v. Segui*, 91 F.3d 337, 348 (2d Cir. 1996) (citation omitted); *see also Wolff v. Rare Medium, Inc.*, 171 F. Supp. 2d 354, 357-58 (S.D.N.Y. 2001) (citation omitted). "In pleading these elements, a plaintiff must identify what provisions of the contract were breached as a result of the acts at issue." *Wolff*, 171 F. Supp. 2d at 358 (citation omitted).

"In order to adequately allege the existence of an agreement, 'a plaintiff must "plead the provisions of the contract upon which the claim is based."'" *Howell v. American Airlines, Inc.*, No. 05-CV-3628, 2006 WL 3681144, *3 (E.D.N.Y. Dec. 11, 2006) (quoting *Phoenix Four, Inc. v. Strategic Res. Corp.*, No. 05 Civ. 4837(HB), 2006 WL 399396, at *10 (S.D.N.Y. Feb. 21, 2006) (quoting *Window Headquarters, Inc. v. MAI Basic Four, Inc.*, Nos. 91 Civ. 1816(MBM), 92 Civ. 5283(MBM), 1993 WL 312899, at *3 (S.D.N.Y. Aug. 12, 1993) (quoting *Griffin Bros., Inc. v. Yatto*, 68 A.D.2d 1009, 1009, 415 N.Y.S.2d 114, 114 (App. Div. 3d Dep't 1979)))). "A plaintiff need not attach a copy of the contract to the complaint or quote the contractual provisions verbatim." *Id.* (citing *Window Headquarters*, 1993 WL 312899, at *3 (citing *Mayes v. Local 106, Int'l Union of Operating Eng'rs*, 739 F. Supp. 744, 748 (N.D.N.Y. 1990))). "However, the complaint must at least 'set forth the terms of the agreement upon which liability is predicated . . . by express reference.'" *Id.* (quoting *Phoenix Four*, 2006 WL 399396, at *10; *Chrysler Capital Corp. v. Hilltop Egg Farms, Inc.*, 129 A.D.2d 927, 928, 514 N.Y.S.2d 1002, 1003 (App. Div. 3d Dep't 1987)).

In the present matter, Plaintiff has plausibly alleged its breach of contract claim. According to Defendant, in an October 2010 letter to the New York State Supreme Court Justice overseeing the criminal case surrounding the thefts, Steven Mancuso stated that "Ronald [Mancuso] and Sean McGuigan stole over $1 million from 2000-2005." *See* Dkt. No. 31-8 at 4. Moreover, Defendant relies on Ronald Mancuso's confession to the thefts, in which he admits that the thefts continued through "September of 2004," when "the City of Syracuse began to change out the single space parking meters with the 'pay stations.'" *See* Dkt. No. 31-9 at 4.

Contrary to Defendants' assertions, however, these documents do not render Plaintiff's breach of contract claim implausible. Even if the Court were to agree that a non-party's confession in the criminal matter that led to the present action and a letter from Ronald Mancuso's brother, who did not have personal knowledge of the events that allegedly transpired, should be considered documents upon which the pleading relied or facts of which the Court may take judicial notice, they do not warrant dismissal of this claim. Sean McGuigan and Ronald Mancuso clearly would have reason to admit to less than what was actually stolen and that the criminal enterprise terminated sooner than it actually did. His assertion that the thefts continued through only September of 2004 would limit his own liability for his participation in the enterprise and would potentially lead to a shorter term of incarceration. Such admissions clearly are not binding on Plaintiff in this civil action.

Further, the Court finds that these documents are not properly considered at the motion to dismiss stage because Plaintiff only makes reference to these events in two isolated instances in the complaint, in what is a clear attempt to lay a foundation for when it should have been on notice regarding the ongoing thefts. Specifically, the amended complaint alleges that "Paul and Steven Mancuso informed FBI agents of the parking meter thefts between their guilty verdict on

or about October 28, 2009 and the date set for sentencing on or about May 24, 2010." *See* Dkt. No. 22 at ¶ 84. The amended complaint further alleges that "[t]he FBI questioned Ronald Mancuso in late November of 2009. On Wednesday, November 25, 2009, Ronald Mancuso confessed to the parking meter theft scheme." *See id.* at ¶ 87. This passing reference to these events does not meet the high bar courts have set in order to recognize documents extraneous to the complaint as "incorporated by reference." *See Global Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 156 (2d Cir. 2006) (holding that a complaint's reference to a guilty plea does not make the transcript of the plea proffer integral to the complaint); *Thomas v. Westchester County Health Care Corp.*, 232 F. Supp. 2d 273, 276 (S.D.N.Y. 2002) (holding that an extraneous document was not incorporated by a brief reference to it in one paragraph of the complaint); *Madu, Edozie & Madu, P.C. v. SocketWorks Ltd. Nigeria*, 265 F.R.D. 106, 124 (S.D.N.Y. 2010) (holding that "a single implicit reference to the e-mail," in which the complaint "makes no explicit reference to, nor does it quote at all from," is insufficient to establish that the e-mail was incorporated by reference into the complaint) (citations omitted).

Finally, Defendant relies on a memorandum prepared by counsel for the City in connection with Mr. Mancuso's and Mr. McGuigan's guilty pleas that provided the amount allegedly lost as a result of the parking meter theft. *See* Dkt. No. 31-12. In that memorandum, prepared for the criminal matter, the City listed its damages as a result of the theft as $2,915,331.03 and the years of the theft running from 1999 through 2005. *See id.* at 3. Defendant claims that the District Attorney later confirmed the total amount of these thefts at a restitution hearing. *See* Dkt. No. 31-13 at 3. What Defendant does not mention, however, is that the District Attorney then informed the court at the restitution hearing that the City had instituted a civil proceeding (this action), that it was withdrawing its request for a restitution

hearing against the criminal defendants, and that it would be very difficult to determine what the appropriate amount of restitution would be. *See id.* at 4-5.

Although Plaintiff may be able to properly rely on these documents and statements in a motion for summary judgment or at trial, they are not properly considered in the present motion to dismiss. Plaintiff did not rely on the terms and effects of these documents and statements in drafting its complaint, and Plaintiff's knowledge of their existence is insufficient for this exception to apply. *See Global Network Commc'ns, Inc.*, 458 F.3d at 156 (quotation omitted); *Williams v. Time Warner Inc.*, 440 Fed. Appx. 7, 9 (2d Cir. 2011) (holding that "[a] mere passing reference or even references, however, to a document outside the complaint does not, on its own, incorporate the document into the complaint itself" (citation omitted)). In light of this conclusion, the Court finds that Plaintiff has plausibly alleged a breach of contract claim that is not barred by New York's six-year statute of limitations.

Based on the foregoing, the Court denies Defendant's motion to dismiss Plaintiff's breach of contract claim accruing on or after June 8, 2005.


### 2. Employer liability for employee's tortious conduct[3]

"An employer is vicariously liable for the torts of its employee, even when the employee's actions are intentional, if the actions were done while the employee was acting within the scope of his or her employment." *Kirkman v. Astoria Gen. Hosp.*, 204 A.D.2d 401, 402 (2d Dep't 1994) (citing *Riviello v. Waldron*, 47 N.Y.2d 297, 302, 391 N.E.2d 1278, 418 N.Y.S.2d 300 (1979)). "However, there is no vicarious liability on the part of the employer for

---

[3] Since Plaintiff alleges claims of fraud, conversion and negligence against Defendant, some of which conduct was perpetrated by its employee, Sean McGuigan, the Court will address whether Defendant may be held vicariously liable for the actions of its employee.

torts committed by the employee solely for personal motives unrelated to the furtherance of the employers' business." *Id.* (citations omitted). Thus, as the New York State Court of Appeals has indicated, an employer may be held vicariously liable when the employee acts negligently or intentionally, "so long as the tortious conduct is generally foreseeable and a natural incident of the employment." *Judith M. v. Sisters of Charity Hosp.*, 93 N.Y.2d 932, 933 (1999) (citing *Riviello v. Waldron*, 47 N.Y.2d 297, 304); *see also State Farm Insurance Co. v. Central Parking Systems, Inc.*, 18 A.D.3d 859, 859-60 (2d Dep't 2005) (citation omitted).[4]

The plaintiff bears the burden of establishing that the defendant's employee committed the tort while acting within the scope of employment. *See Campos v. City of New York*, 195 Misc. 2d 624, 625, 759 N.Y.S.2d 843, 844 (N.Y. Sup. Ct. 2003) (citing *Davis v. City of New York*, 226 A.D.2d 271, 271-72 (1st Dep't 1996)). The New York State Court of Appeals has indicated that the following factors should be considered in determining whether a tortious act was committed within the employee's scope of employment:

> "[1] the connection between the time, place and occasion for the act, [2] the history of the relationship between employer and employee as spelled out in actual practice, [3] whether the act is one commonly done by such an employee, [4] the extent of departure from normal methods of performance; [and] [5] . . . whether the specific act was one that the employer could reasonably have anticipated."

*Haybeck v. Prodigy Servs. Co.*, 944 F. Supp. 326, 329 (S.D.N.Y. 1996) (*Riviello v. Waldron*, 47 N.Y.2d 297, 302, 418 N.Y.S.2d 300, 391 N.E.2d 1278 (Ct. App. 1979)). Since the

---

[4] The Court notes that, even where an employer cannot be held vicariously liable for an employee's tortious conduct, the employer may still be held liable under theories of negligent hiring and negligent supervision. *See State Farm Insurance Co.*, 18 A.D.3d at 860 (citation omitted). Plaintiff's complaint, however, does not assert a claim for negligent retention or supervision and Plaintiff does not attempt to assert such claims in its response to Defendant's motion to dismiss.

determination concerning the scope of employment depends heavily on the facts and circumstances of each particular case, the question is ordinarily, but not always, one for the jury. *Mendez v. City of New York*, 7 A.D.3d 766, 767-68 (2d Dep't 2004) (citation omitted).

In the present matter, Plaintiff alleges that Defendant is liable for fraud because of Sean McGuigan's actions. *See* Dkt. No. 22 at ¶¶ 137-156. Plaintiff contends that the monthly invoices that Defendant sent to Plaintiff's supervisor in the Bureau of Transportation contained fraudulent representations as to the collection activity from its parking meters. *See id.* at ¶¶ 139-141. Moreover, Plaintiff claims that these invoices, which were submitted on or about the first week of every month, "did not reflect the accurate collection activity for the week or even the month because of the coins stolen weekly and then a certain number of coins returned by Defendant[']s employee." *See id.* at ¶¶ 142-143. Further, Plaintiff claims that the weekly collection summaries which were prepared by Defendant were delivered by Sean McGuigan to Plaintiff and contained an incomplete factual depiction of collection activities due to the coins that were stolen. *See id.* at ¶¶ 145-146. Finally, Plaintiff alleges that Defendant's coin manager and money department manager made false financial representations to Key Bank on every day that collections were scheduled when they informed Key Bank the amount to credit Plaintiff's account, which did not include the amount of coins stolen by Sean McGuigan. *See id.* at ¶¶ 150-151.

As Plaintiff's allegations make clear, Sean McGuigan's actions were solely for personal motives unrelated to the furtherance of Defendant's business. Although it is true that Sean McGuigan was able to steal from Plaintiff because of his employment, his criminal conduct was neither incidental to the furtherance of Defendant's business, nor induced by Defendant. *See Kirkman*, 204 A.D.2d at 402 (citations omitted); *see also Goldstein v. United States*, 14 Fed.

Appx. 115, 116 (2d Cir. 2001) (citations omitted).

In *Goldstein*, the plaintiff brought suit against the United States and the Department of Veteran Affairs alleging that various employees stole documents and medical records that he mailed to the office in connection with a request for benefits. *See Goldstein*, 14 Fed. Appx. at 116. Applying New York law, the district court dismissed the suit finding that the plaintiff fail to establish that the defendant should be vicariously liable for thefts committed by its employees. *See id.* Agreeing with the district court, the Second Circuit held that "[t]here is no evidence in the record to suggest that the defendants induced or otherwise approved of its employees committing the purported theft of Goldstein's medical records and, as such, the doctrine of respondeat superior is not applicable to impose liability on the defendants." *Id.* (citations omitted).

In *State Farm Ins. Co.*, the plaintiff brought suit against the defendant for negligence and breach of contract after the defendant's employee, a car attendant, stole the plaintiff's car. *See State Farm Ins. Co.*, 18 A.D.3d at 859. Dismissing all but the breach of bailment contract claims, the Appellate Division held that the defendant established its "entitlement to judgment as a matter of law dismissing the plaintiff's claim under the theory of respondeat superior by producing evidence that theft of the subject car . . ., by one of the defendant's employees, was outside the scope of that employee's duties as a car attendant." *Id.* (citations omitted).

In the present matter, Plaintiff has not alleged that Defendant induced Sean McGuigan to steal from Plaintiff or otherwise approved of his conduct. Although some cases have found vicarious liability for an employee's illegal conduct, in those cases the illegal conduct in question benefitted the employer in some tangible way. *Cf. CompuDyne Corp. v. Shane*, 453 F. Supp. 2d 807, 831 (S.D.N.Y. 2006) (finding that the defendant-employer may be liable for its

employee's illegal trades because the defendant benefitted financially from the scheme). Since Plaintiff has not alleged that Sean McGuigan's conduct benefitted Defendant in any way, or that Defendant induced his conduct, the Court finds that Plaintiff has failed to allege facts plausibly suggesting that Defendant is vicariously liable for Sean McGuigan's tortious conduct. *See Banque Worms v. Luis A. Duque Pena E Hijoz, Ltda.*, 652 F. Supp. 770, 773 (S.D.N.Y. 1986) (applying New York law and holding that "[a]n employer who is acting in good faith and who has not induced an employee to commit an intentional tort is not liable for the employee's acts" (citations omitted)). As such, the Court grants Defendant's motion to dismiss Plaintiff's fraud, negligence and conversion claims since Plaintiff has failed to allege sufficient facts to establish that Defendant should be liable for Sean McGuigan's tortious conduct. *See id.* (citation omitted); *see also Compass Group, U.S.A., Inc. v. Masula*, 18 A.D.3d 1094, 1094-95 (3d Dep't 2005) (holding that "'there is no vicarious liability on the part of the employer for torts committed by the employee solely for personal motives unrelated to the furtherance of the employer's business'" (quotation and other citations omitted)); *C.D. of N.Y.C., Inc. v. U.S. Postal Service*, No. 03 Civ. 5055, 2004 WL 2072032, *5 (S.D.N.Y. Sept. 16, 2004) (holding that the majority view is that employers are not liable for theft committed by employees) (citation omitted); *Gottlieb v. Sullivan & Cromwell*, 203 A.D.2d 241, 242 (2d Dep't 1994) (holding that "the criminal acts committed by the defendant's employees were outside of the scope of their employment and in no way advanced the interests of the defendant, so that the defendant could not be held liable under a theory of respondeat superior" (citations omitted)).

### *3. Fraud[5]*

Plaintiff's fraud claim against Defendant is based upon three categories of allegedly fraudulent statements: (1) Defendant's monthly invoices; (2) Defendant's weekly manifests of coin accountings; and (3) deposit statements provided by Defendant, through Sean McGuigan, to Key Bank advising the bank the amount to credit Plaintiff's account. *See* Dkt. No. 22 at ¶¶ 142, 144-46, 149-51. Defendant argues that the Court should dismiss Plaintiff's fraud claim because it is duplicative of its breach of contract claim and because Plaintiff failed to allege facts sufficient to establish a *prima facie* claim for fraud against Defendant. *See* Dkt. No. 32 at 16-17.[6]

"To state a claim for fraudulent misrepresentation under New York law, a plaintiff must show that (1) the defendant made a material false representation, (2) the defendant intended to defraud the plaintiff thereby, (3) the plaintiff reasonably relied upon the representation, and (4) the plaintiff suffered damage as a result of such reliance." *Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.*, 375 F.3d 168, 186-87 (2d Cir. 2004) (internal quotation marks

---

[5] Under Rule 9(b) of the Federal Rules of Civil Procedure, fraud must be pled with particularity, "which requires that the plaintiff (1) detail the statements (or omissions) that the plaintiff contends are fraudulent, (2) identify the speaker, (3) state where and when the statements (or omissions) were made, and (4) explain why the statements (or omissions) are fraudulent." *Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.*, 375 F.3d 168, 187 (2d Cir. 2004) (internal quotation marks and citation omitted). "'[P]laintiffs must allege facts that give rise to a strong inference of fraudulent intent,' which may be established 'either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness.'" *Id.* (quotation omitted).

[6] Although the Court has found that Defendant is not vicariously liable for Sean McGuigan's tortious conduct, Plaintiff's complaint alleges that Defendant, even absent vicarious liability, engaged in tortious conduct against it. As such, the Court will address the sufficiency of Plaintiff's tort claims.

and citation omitted). Similarly, "fraudulent concealment requires proof of: (1) failure to discharge a duty to disclose; (2) an intention to defraud, or scienter; (3) reliance; and (4) damages." *TVT Records v. Island Def Jam Music Group*, 412 F.3d 82, 90-91 (2d Cir. 2005) (citing *Brass v. Am. Film Techs., Inc.*, 987 F.2d 142, 152 (2d Cir. 1993)). Thus, with the exception of their respective first elements, the two torts are indistinguishable.

"'[I]t is well settled that mere allegations of breach of contract do not give rise to a claim for fraud or fraudulent inducement.'" *Ohm Remediation Servs. Corp. v. Hughes Envtl. Sys., Inc.*, 952 F. Supp. 120, 122 (N.D.N.Y. 1997) (quotation and other citation omitted); *see also D.S. Am. (East), Inc. v. Chromagrafx Imaging Sys., Inc.*, 873 F. Supp. 786, 795 (E.D.N.Y. 1995). "General allegations that [the] defendant entered into a contract while lacking the intent to perform it are insufficient" to support a claim for fraudulent misrepresentation or concealment. *N.Y. Univ. v. Cont'l Ins. Co.*, 87 N.Y.2d 308, 318 (1995); *TVT Records*, 412 F.3d at 91 (holding that "the intention to breach does not give rise to a duty to disclose. Instead, the duty to disclose must exist separately from the duty to perform under the contract" (citing *Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc.*, 98 F.3d 13, 20 (2d Cir. 1996))) (other citations omitted). "A fraud claim should be dismissed as redundant when it merely restates a breach of contract claim, *i.e.*, when the only fraud alleged is that the defendant was not sincere when it promised to perform under the contract." *First Bank of Americas v. Motor Car Funding, Inc.*, 690 N.Y.S.2d 17, 20-21 (1st Dep't 1990) (citation omitted).

The Second Circuit has consistently held that an allegation that a party entered into a contract with no intention of performing that contract is generally insufficient to support a fraud claim under New York law. *See TVT Records*, 412 F.3d at 91; *Manning v. Utils. Mut. Ins. Co.*, 254 F.3d 387, 401 (2d Cir. 2001) (holding that a representation which "is merely a statement of

intent to perform under the contract cannot constitute fraud"); *Bridgestone/Firestone*, 98 F.3d at 19-20 (dismissing fraud claim where the alleged misrepresentations "amount to little more than intentionally-false statements . . . indicating [the defendant's] intent to perform under the contract"); *cf. Grappo v. Alitalia Linee Aeree Italiane*, 56 F.3d 427, 434 (2d Cir. 1995) (collecting New York cases). "To maintain a fraud claim alongside a breach-of-contract claim, a plaintiff must (1) 'demonstrate a legal duty separate from the duty to perform under the contract'; (2) 'demonstrate a fraudulent misrepresentation collateral or extraneous to the contract'; or (3) 'seek special damages that are caused by the misrepresentation and unrecoverable as contract damages.'" *B & M Linen, Corp. v. Kannegiesser, USA, Corp.*, 679 F. Supp. 2d 474, 480 (S.D.N.Y. 2010) (quotation omitted).

In the present matter, Plaintiff asserts that its fraud and breach of contract claims are not duplicative because it has alleged facts establishing that this case falls under all three exceptions to the general rule. Moreover, Plaintiff argues that it has sufficiently pled a fraud cause of action against Defendant.

The Court does not need to reach a decision on whether Plaintiff's fraud claim is duplicative of its breach of contract claim, however, because Plaintiff has failed to allege facts plausibly suggesting that Defendant intended to defraud it. The only relevant allegation of intentional fraud involves Mr. McGuigan, acting outside the scope of his employment, which, as discussed, is insufficient to impute liability to Defendant. Plaintiff alleges that Defendant, through its "coin manager and the money department manager," among others, sent communications to Plaintiff and Key Bank that were fraudulent because they misrepresent Defendant's collection activity and total amount actually collected. *See* Dkt. No. 22 at ¶¶ 139-151. Plaintiff, however, does not allege that these individuals knew that these statements were

fraudulent or that they intended to perpetrate a fraud against Plaintiff. These conclusory allegations, which fail to allege with particularity that Defendant intended to defraud Plaintiff, are insufficient and unsupported by the factual underpinnings of the amended complaint; and, therefore, the Court finds that Plaintiff's fraud claim against Defendant must fail. *See Rafter v. Liddle*, 704 F. Supp. 2d 370, 377-78 (S.D.N.Y. 2010) (dismissing fraud claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure).

Based on the foregoing, the Court grants Defendant's motion to dismiss Plaintiff's fraud cause of action.

### 4. Conversion

Under New York law, "[c]onversion is 'an unauthorized assumption and exercise of the right of ownership over [property] belonging to another to the exclusion of the owner's rights.'" *Traffix v. Herold*, 269 F. Supp. 2d 223, 228 (S.D.N.Y. 2003) (quotation omitted). Specifically, a conversion action requires that the plaintiff has legal ownership or an immediate superior right of possession to the property he seeks to recover and that the defendant exercised an unauthorized dominion over that property "'to the alteration of its condition or to the exclusion of the plaintiff's rights.'" *Ancile Inv. Co. Ltd. v. Archer Daniels Midland Co.*, 784 F. Supp. 2d 296, 311 (S.D.N.Y. 2011) (quotation and other citation omitted). When money, rather than a chattel, is the property at issue, it must be specifically identifiable. *See 9310 Third Ave. Associates, Inc. v. Schaffer Food Serv. Co.*, 210 A.D.2d 207, 208 (2d Dep't 1994) (citation omitted). If the "allegedly converted money is incapable of being 'described or identified in the same manner as a specific chattel' . . . , it is not the proper subject of a conversion action." *Id.* (internal citation omitted).

In its conversion cause of action, Plaintiff alleges that Defendant's "intentional unauthorized use of coins . . . resulted in loss and damage to the City of Syracuse[.]" *See* Dkt. No. 22 at ¶ 182. Plaintiff does not specifically allege how much money was allegedly converted by Defendant and, in its prayer for relief, simply requests a "[j]udgment against defendant[ ] for compensatory [damages], in an amount to be determined at trial." This conclusory allegation is insufficient to support a claim for conversion. *See In re Bernard L. Madoff Inv. Securities LLC*, 458 B.R. 87, 133 (Bkrtcy. S.D.N.Y. 2011) (holding that "[b]ecause the Complaint does not seek a specific amount of money converted from a particular account, but rather 'an award of compensatory damages in an amount to be determined at trial' it fails to state a claim for conversion under New York law").

Moreover, Plaintiff fails to allege that Defendant ever had possession of the allegedly converted funds. Plaintiff's complaint makes clear that Sean McGuigan gave the stolen money to Ronald Mancuso, who then returned the nickels and dimes to Mr. McGuigan the following Tuesday. Mr. McGuigan would then bring these nickels and dimes to Defendant's office. As such, Plaintiff clearly fails to allege that Defendant ever had possession of the allegedly converted funds.

Based on the foregoing, the Court finds that Plaintiff has failed to allege facts plausibly suggesting that Defendant is liable for conversion. As such, the Court grants Defendant's motion to dismiss this claim.[7]

---

[7] New York law permits a claim for aiding and abetting conversion where the plaintiff can prove (1) the existence of a violation committed by the primary party; (2) knowledge of this violation on the part of the aider and abettor; and (3) substantial assistance by the aider and abettor in achievement of the violation. *See Calcutti v. SBU, Inc.*, 273 F. Supp. 2d 488, 493 (S.D.N.Y. 2003) (citing cases). While "wrongful intent is not an essential element of the conversion," *Leve v. C. Itoh & Co. (Am.), Inc.*, 136 A.D.2d 477, 478 (1st Dep't 1988) (citing

(continued...)

### 5. Negligence and negligent misrepresentation

In its fourth cause of action, Plaintiff alleges that Defendant is liable for its negligence and negligent statements (misrepresentation). *See* Dkt. No. 22 at ¶¶ 157-176.

"Under New York law, 'the elements of a negligence claim are the existence of a duty, a breach of that duty, and damages proximately caused by that breach of duty.'" *Hammond v. The Bank of New York Mellon Corp.*, No. 08 Civ. 6060, 2010 WL 2643307, *9 (S.D.N.Y. June 25, 2010) (quotation and other citation omitted). It is well-settled that a claim arising out of an alleged breach of contract may not be converted into a tort action, absent the violation of a legal duty or special relationship independent of that created by the contract. *See Givoldi, Inc. v. United Parcel Service*, 286 A.D.2d 220, 221 (1st Dep't 2001) (citation omitted). "'This legal duty must spring from circumstances extraneous to, and not constituting elements of, the contract, although it may be connected with and dependent upon the contract.'" *Id.* (quoting *Clark–Fitzpatrick, Inc. v. Long Is. R.R. Co.*, 70 N.Y.2d 382, 389, 521 N.Y.S.2d 653, 516 N.E.2d

_____

[7](...continued)
cases), a plaintiff must show that the defendant "aided and assisted" the converter "with culpable knowledge that such funds did not belong to [the converter]." *Weisman, Celler, Spett & Modlin v. Chadbourne & Parke*, 271 A.D.2d 329, 330 (1st Dep't 2000); *accord Lenczycki v. Shearson Lehman Hutton, Inc.*, 238 A.D.2d 248, 248 (1st Dep't 1997) (holding that the aider and abettor must "kn[ow] of [the converter's] intention to convert the funds" (citation omitted)). New York "has not adopted a constructive knowledge standard for imposing aiding and abetting liability." *Kolbeck v. LIT Am., Inc.*, 939 F. Supp. 240, 246 (S.D.N.Y. 1996) (citation omitted). Thus, "New York law requires actual knowledge of the wrongful conduct." *Diamond State Ins. Co. v. Worldwide Weather Trading LLC*, No. 02 Civ. 2900, 2002 WL 31819217, *6 (S.D.N.Y. Dec. 16, 2002) (citations omitted).

In the present matter, to the extent that Plaintiff is attempting to allege that Defendant aided and abetted Sean McGuigan's alleged conversion, Plaintiff has failed to allege that Defendant knew of his intention to convert Plaintiff's funds or that it was assisting in the alleged conversion in any way. As such, any claim for aiding and abetting this alleged conversion would necessarily fail as well.

190 (1987)).

Here, in the amended complaint, Plaintiff alleges that, "[p]ursuant to Section 89-bbb(6) of the Armored Car Carrier Act in General Business Law, the parties' relationship creates an independent legal duty distinct from Defendant[']s contractual obligations." *See* Dkt. No. 22 at ¶ 166. Plaintiff claims that Defendant has "a duty based on the nature of the services they perform, its relationship with its customers, and by the fact that failure to properly perform the contract could have far-reaching or appalling consequences." *See id.* at ¶ 168. Contrary to Plaintiff's assertions, the Armored Car Carrier Act does not create a legal duty distinct from Defendant's contract obligations.

First, while Plaintiff cites to the Armored Car Carrier Act, it does not state what, if any, particular provision of the statute that Defendant violated. Plaintiff simply cites to the definitions section of the Act. Without an allegation that Defendant violated one or more provisions of the Armored Car Carrier Act's provisions, Plaintiff's negligence claim must fail. *See Motyka v. City of Amsterdam*, 15 N.Y.2d 134, 139 (1965) (holding that "liability arises out of a statute only in limited instances where disregard of the command of the statute results in damage to one of the class for whose especial benefit the statute was enacted").

Second, to the extent that Plaintiff is attempting to allege that Defendant had a legal duty separate from the contract to provide accurate weekly and monthly statements, the claim is entirely without merit. The contracts themselves require Defendant to report" the total number of meter collections made and the number of meters collected each week during said month." *See* Dkt. No. 22-2 at 11. Further, the contracts require that "[t]he Bank or representative of the City assigned to the Bank by the Commissioner of Finance shall issue a report for containers or receptacles received at the Bank each day." *See id.* at 12. Although the contracts do not specify

the exact format that such reports must be made, it is clear that the contracts require such reports to be issued by Defendant. Moreover, when AMSA and then Defendant took over Key Bank's roll of sorting and counting the money collected from the meters, Defendant was then required to issue a report for containers or receptacles received. These provisions of the contract make clear that Defendant was required to provide this information through the contract, not through some legal duty independent of the contract.

Plaintiff's reliance on *Eiseman v. State of New York*, 70 N.Y.2d 175 (1987) and *Brink's Inc. v. City of New York*, 717 F.2d 700 (2d Cir. 1983) is misplaced. Plaintiff argues that, "[i]n *Brink's*, the Second Circuit affirmed the district court's conclusion that the City of New York specifically 'asserted a separate and independent cause of action for common law negligence' and rejected Brink's argument that 'the City had simply sued in tort where the underlying duty breached was contractual.'" *See* Dkt. No. 38 at 18 (citation omitted). As Defendant correctly points out, the Second Circuit in *Brink's* did not consider or conclude that the plaintiff could concurrently bring negligence and breach of contract claims relating to the defendant's employees stealing from the city's parking meters. In *Brink's*, the jury found that the defendant committed common law negligence and breach of contract and awarded punitive damages. On appeal, the defendant argued that the plaintiff should not have been permitted to proceed with its claim as one for negligence because the claim was based in contract; and, therefore, the award of punitive damages was improper. *See Brink's Inc.*, 717 F.2d at 704-05. The Second Circuit concluded that the defendant was estopped from challenging the plaintiff's maintenance of both a breach of contract and a negligence claim – and the resulting punitive damages award – not because of the presence of an independent duty, but because "throughout the case Brink's accepted the view that this was a negligence case." *See id.* at 705. The court found that the

43

defendant's challenge that there was insufficient evidence to justify the submission of punitive damages to the jury was insufficient to preserve the argument on appeal that the case was based solely in contract, not negligence.  *See id.*  Unlike *Brink's*, however, Defendant is explicitly challenging in its motion Plaintiff's ability to assert both negligence and breach of contract claims.

Similarly unpersuasive is Plaintiff's reliance on *Eiseman* to suggest that Defendant had an independent "duty to give correct information."  *See* Dkt. No. 38 at 19.  *Eiseman* involved an action against a university brought by the estate of a student who was raped and murdered by an ex-felon who had been accepted into the university's special program for the disadvantaged.  *See Eiseman*, 70 N.Y.2d at 180.  Not only did the *Eiseman* court deny the plaintiff's negligence claim, the case did not involve any claims for breach of contract whatsoever.

Since Plaintiff has failed to allege the violation of a duty independent from the contract, its negligence claim must fail.  *See Clark-Fitzpatrick, Inc. v. Long Island R.R. Co.*, 70 N.Y.2d 382, 389 (1987) (dismissing negligence claims because there was no violation of a "legal duty independent of the contract").  Based on the foregoing, the Court grants Defendant's motion to dismiss Plaintiff's negligence claims.

## IV. CONCLUSION

After carefully reviewing the entire record in this matter, the parties' submissions and the applicable law, and for the above-stated reasons, the Court hereby

**ORDERS** that Defendant's motion to dismiss is **GRANTED in part** and **DENIED in part**; and the Court further

**ORDERS** that Plaintiff's claim for "successor liability" is **DISMISSED with prejudice**;

and the Court further

**ORDERS** that Plaintiff's breach of contract claims accruing prior to June 8, 2005 are

**DISMISSED with prejudice**; and the Court further

**ORDERS** that Plaintiff's negligence, fraud and conversion claims are **DISMISSED**

**with prejudice**;[8] and the Court further

**ORDERS** that this case is referred to Magistrate Judge Dancks for all further pretrial

matters; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum-Decision

and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

Dated: September 28, 2012
      Albany, New York

**Mae A. D'Agostino**
**U.S. District Judge**

---

[8] As a result of this Memorandum-Decision and Order, the only remaining cause of action is Plaintiff's breach of contract claim, but only as to the alleged breaches that occurred on or after June 8, 2005.